UNIVERSITY INTERSCHOLASTIC LEAGUE V.
MIDWESTERN UNIVERSITY ET AL.

No. A-3802. Decided February 25, 1953.
(255 S. W. 2d Series 177)

*Hart, Brown & Sparks* and *J. H. Hart*, all of Austin, for petitioner.

The Court of Civil Appeals erred in holding that such of the public schools as may choose may not form an association for the promotion by themselves of their numerous school competitions and require that the schools which choose to become members shall abide by the rule of the association which the members adopt, and which each school, upon becoming a member, agrees to abide by, and that a college which is not a party to the contract between the school district and the League may enjoin the enforcement of that contract. House v. Houston Waterworks, 88 Texas 233, 31 S. W. 179; Magnolia Petroleum Co. v. McClendon, 123 Texas 10, 65 S. W. 2d 484; Crouch v. Southern Methodist University, 10 S. W. 2d 973.

*Guy Rogers*, of Wichita Falls, for respondent.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

Midwestern University sued Wichita Falls Independent School District and University Interscholastic League for specific performance of an alleged written contract. We shall refer to these parties as "Midwestern", "the District" and "the League", re-

spectively. Midwestern got judgment in the trial court, and the Court of Civil Appeals affirmed. 250 S. W. 2d., 587.

For use by its schools, the District owned a football field known as Coyote Stadium. Hardin College, Midwestern's predecessor, had no playing field, so it began negotiations with the District for the use of Coyote Stadium. On April 10, 1947, these negotiations terminated in a written contract, the provisions of which relative to the issues before us were as follows:

After reciting that a joint meeting had been held on March 24, 1947, by the trustees of the District and Hardin College, at which it was agreed "that *Hardin College is to use Coyote Stadium for its football games*", the contract recites that "the following terms are, therefore, agreed upon: (1) The Hardin College shall use the Coyote Stadium for a period of ten (10) years and for that use will pay annually to the * * * District the sum of $5,500.00, conditioned upon playing a *home schedule* of six (6) football games per year. (2) Should Hardin College desire *to play* more than six (6) football games in any one football season, it is agreed that they will pay $600.00 for each additional game played at Coyote Stadium * * *. (3) Hardin College is to receive credit on the per cent paid by the Concessionaire for *all games played under its name* at Coyote Stadium * * * and this percentage will be credited to Hardin College *for each of its games played* during this season * * *. (6) Hardin College agrees to pay the costs of all electricity as a result of staging *its* football games at Coyote Stadium * * *. (7) All expense in connection with policing *its games* will be cared for by the Hardin College * * * ." (All italics ours.)

Later Hardin College became Midwestern .University. Consequently, on May 19, 1950, the governing bodies of Midwestern and the District executed a written contract which was identical with the Hardin. College contract, except that paragraph (1) was changed to substitute "Midwestern University" for "Hardin College" and "seven (7) years" was substituted for "ten (10) years".

Prior to 1951 the Maskat Temple of the Shrine had sponsored a football game, known as the Oil Bowl All Star game, annually in Coyote Stadium. This game was between high school stars from Texas and Oklahoma who had graduated from high schools but had not entered college. The net proceeds were devoted to charities through the agency of Maskat Temple.

The League was first organized in 1910, at the State Teachers' Meeting in Abilene. Since then it has been organized *annually* under the auspices of The Bureau of Public School Service, Division of Extension, The University of Texas. During its first year the League's activities were confined to debates among the high schools affiliated with the University of Texas. For the second year declamation was added and through the years since, its activities in the field of interscholastic competition have spread into many and varied subjects, e.g., choral singing, extemporaneous speech, one-act plays, story telling, music appreciation, spelling, typewriting, shorthand, tennis, football, track, and numerous others. Its original membership of 28 schools had grown to 2647 schools in 1951, despite the many school consolidations effected during those years. Its scope is thus stated by the League in an introduction to its Constitution and Rules published in 1951: "This League covers a larger geographical area, serves more different types of schools, schedules a greater variety of contests, holds larger and a large number of meets, and enjoys a greater school-membership than any similar organization in the United States." Its importance in the public school life of the state is alleged in the District's answer in the trial court to be so great that, while membership in the League is "technically" voluntary, it is actually compulsory. "The nature and scope of the membership of the Interscholastic League is such that were a school not to belong to the League and compete according to its rules, it would be effectively placed in a position of being unable to hold competitive football athletics during the current year, and that thereby both the scholastic and educational benefits of good citizenship and good sportsmanship which are derived from competitive sports would be lost unto the said school and its students. It is therefore a duty, if not a public mandate, that the school district and its agencies, the schools, maintain such membership * * * for the benefit of the students and the public of the area."

In April, 1951, by mail vote, the member schools of the League adopted League Rule No. 34, which provides: "All Star Games. No athletic director, coach, teacher or administrator of a member-school shall at any time assist either directly or indirectly with the coaching, management, direction, selection of players, promotion, officiating or allow public school facilities or equipment to be utilized in any all-star game (exception Texas High School Coaches Association game), in which one or more of the competing team is composed of a player or players who, during the previous school year, were members of a high school

football team. Any member high school violating the provisions of this all-star contest rule shall be subject to probation or suspension. (Effective school year 1951-52)."

The District participated in this election by voting "No". But, with knowledge that the Rule had been adopted as a part of League's Rules for 1952, by which it would be bound, District's high school on November 14, 1951, applied for, and got, membership in the League for 1952, after its principal had signed this written statement: "We hereby accept the University Interscholastic League High School Football Plan for 1952 and agree to abide by all the rules and regulations set forth in the Constitution and Rules." Shortly before this and because of Rule 34 the District had refused a request by Maskat Temple for a booking of the Oil Bowl Charity Game for August, 1952; and, upon subsequent application by Midwestern for such booking under its contract, District had petitioned League for a ruling as to whether, to permit "Midwestern and Shrine Temple to use the facilities at Coyote Stadium to stage the Oil Bowl Game", under its agreement with Midwestern, would violate Rule 34; and District had been advised in a letter from League's Director under date of October 11, 1951, that its executive committee had ruled that the proposed use of Coyote Stadium would violate Rule 34.

On February 9, 1952, the president of District's Board received a letter from Midwestern's president, which stated: "This is to advise you and your Board that Midwestern and the Oklahoma Coaches Association will sponsor the Oil Bowl Charity Game in Wichita Falls this year. We will play the game Friday night, August 29, 1952, in Coyote Stadium under the terms of our contract for the use of the stadium. This game will be one of our regular season games."

After receiving this notice the District again appealed to the League's Executive Committee for advice "in order that the Wichita Falls Schools may protect our rights under the League Football Plan, of which we are a part," and was again advised that such use of Coyote Stadium would violate Rule 34. District's board president then wrote Midwestern's president stating the League's ruling and concluding, "I am officially communicating this information to you with the statement that it will be impossible for the Board of Education of the Wichita Falls Independent School District to allow the use of Coyote Stadium for staging the Oil Bowl Charity Game under the terms of the con-

tract which we have with your institution for the use of Coyote Stadium. I regret that it becomes necessary to make this statement, but in light of the ruling made by the Interscholastic League we have no other alternative."

On March 25, 1952, Midwestern brought the issue to a head by filing this suit. Under its trial pleadings, its second amended original petition, it sought specific performance of its contract with the District to the end that Coyote Stadium be made available to it for August 29, 1952, "and at such dates during such succeeding years as may be designated", and that a mandatory injunction issue requiring the District to permit such use. It prayed also that the League be permanently enjoined (1) from interfering with University's use of Coyote Stadium on August 29, 1952, and "such dates in such years as may be designated during the life of the contract", and (2) from in any manner penalizing the District or any of its schools under the provisions of Rule 34.

Following a general denial, the District specially denied having made or being bound by any contract with Midwestern providing for any football game in Coyote Stadium under Midwestern's sponsorship wherein neither participating team is that of Midwestern. Then it pleaded that the letters and agreements relating to Midwestern's use of the stadium distinctly say the use shall be "for staging its football games" or for "playing a home schedule of six football games per year"; that established usage for over 30 years provides that the playing of a home game by a school's team necessitates that all members of the team be students of the school sponsoring the game with definite minimum scholastic qualifications; that Midwestern "has already" scheduled and published six home games for the 1952-1953 season, and that neither on that schedule nor elsewhere does the Oil Bowl Game appear as a game sponsored by Midwestern.

The District further pleaded that, if mistaken in the above allegations and subject thereto, and in the event it be found that the District is under contract with Midwestern which gives the latter the right to schelule and sponsor the Oil Bowl Game, the District "will be placed in a position of unnatural jeopardy" in that if it refused to perform the contract it would be liable in damages to Midwestern, whereas if it permits the game to be played it will be liable to suspension or expulsion by the League, under Rule 34. Then after pleading the advantages of League

membership, some of which we have stated above, it says it is entitled to be protected "from such a position of jeopardy", the gravity of which "is a matter of public concern". It concludes with a prayer for a permanent injunction restraining the League from inflicting any penalties against it under Rule 34, if the court concludes that it is under contractual obligation to permit Midwestern to sponsor the Oil Bowl Game in Coyote Stadium.

In answer to Midwestern's allegations, the League pleaded that the contract between Midwestern and the District in no sense binds the District to permit the Oil Bowl Game to be played in Coyote Stadium. As against both Midwestern and the District, it pleaded the circumstances attending the adoption of Rule 34, the District's knowledge of, and participation in, its adoption and the District's voluntary acceptance of the Rule by its later application for, and acceptance of, League membership for 1952.

After trial without a jury, the trial court entered judgment for Midwestern against both the District and the League and for the District against the League and recited that the contract between Midwestern and the District "is specially enforced by this court and directed to be carried out according to its terms for the period therein covered." Accordingly, it granted Midwestern a mandatory injunction against the District requiring the latter to carry out the contract, including making available to Midwestern "the use of Coyote Stadium for August 29, 1952, and such other dates during the contract period as may be designated" by Midwestern. It also enjoined the League from "in any manner interfering with the performance of the above contract by the parties thereto" and from "in any manner inflicting sanctions upon" the District and "from using expulsion, suspension or probation of any of its (District's) public schools from membership" in the League, because of its performance "in whole or in part of its contract with Midwestern University as specifically enforced above."

To this judgment both the League and the District duly excepted and gave notice of appeal. But only the League filed an appeal bond.

However, in a brief filed in the Court of Civil Appeals, which it calls a brief for appellee, the District did assign error in the trial court's holding that the contract between the District and Midwestern gives the latter a right to use Coyote Stadium for the

Oil Bowl Game on August 29, 1952, and on such subsequent dates during the contract period as Midwestern may designate, irrespective of the fact that Midwestern's own team may not be a contestant therein. To that extent it made common cause with the League which,, as appellant, urged the same error as its first point in the Court of Civil Appeals.

The Court of Civil Appeals held that there was no error in the trial court's judgment as to Midwestern's contractual right to sponsor the Oil Bowl Game in Coyote Stadium on August 29, 1952, and on such subsequent dates throughout the life of the contract as Midwestern may designate. Its discussion of the language of the contract which it thought to support that conclusion is as follows: "The contract itself does not specifically say that games other than the six shall be played by the teams of appellee, yet there are words in effect in the contract, such as quoted in paragraph (3), which may be construed to mean that appellee could sponsor as many games in the stadium as it cared to pay for, provided the schedule of such games did not interfere with the use of such stadium by its owner."

Both the League and the District (the latter as a respondent) are here attacking that holding, by appropriate points of error.

█ It will be observed from the quoted language of the Court of Civil Appeals that it based its conclusion on the terms of the contract, without any suggestion that the contract is ambiguous. We are in accord with that approach, as we find no ambiguity in the contract. In that situation, it is elementary law that the intention of the parties to a written instrument is to be determined by the language of the instrument as a whole. Applying that principle, we find no support for the conclusion reached by the courts below.

We have quoted all the language in the contract which has any relation to the question before us. The contract recites that at a meeting of the trustees of the District and Hardin College it was agreed that the latter "is to use Coyote Stadium for its games", for a period of 10 years, and for "that use" was to pay $5,500, "conditioned upon playing a home schedule" of 6 games; if it should elect "to play" more than 6 games in any football season it was to pay $600 for each additional game played; Hardin College was to "receive credit on the per cent paid by the concessionaire for all games played under its name" at the sta-

dium, this percentage to be "credited to Hardin College for each of *its games played* during this season"; Hardin College was to pay the cost of all electricity used as a result of staging *its* football *games at* Coyote Stadium and all expenses incurred in policing *its* games. All this language was incorporated in the contract between Midwestern and the District on May 19, 1950. (All italics ours.)

The contract declares the basic agreement reached by the governing boards of Hardin College and the District was that the former *is to use the stadium for its football games,* upon "the following terms". This language clearly can mean no more than that the contracting parties intended that Hardin College should use the stadium for games in which its team was a participant. And there is nothing in "the following terms" that can be considered as expressing any other intention. That it was to pay District $5,500 annually for use of the stadium, conditioned upon a *home schedule* of games per year, means games played by its own team. Such is the common understanding of the words *home schedule,* but if there can be any doubt about that it is dispelled by the language immediately following term (1) of the contract: "(2) Should Hardin College desire *to play* more than six (6) football games in any one football season, it is agreed that they will pay $600.00 for each additional game played at Coyote Stadium". Certainly Hardin College could not *play* a football game except through the agency of its own team. The same import must be ascribed to the repetition of the words *its games* in terms (6) and (7) of the contract relating to operational costs. No contrary meaning can be gleaned from the language of term (3) of the contract that "Hardin College is to receive credit on the per cent paid by the Concessionaire for *all games playel under its name* at Coyote Stadium". Following this language the contract recites that the sums to be paid for concessions at stadium games vary with the years; that the agreement for 1947 provides for 25 per cent of gross receipts. Then follows the provision which renders clear the meaning of the phrase *"all games played under its name"* quoted above. It is that this percentage (25%) "will be credit to Hardin College *for each of its games* played during this season." (Italics ours.)

As successor to Hardin College, Midwestern agreed to all the terms of the contract, except for the number of years it should run; hence its right to use of Coyote Stadium must be determined thereby. It follows that Midwestern had no right under its contract to require the District to let it use Coyote

Stadium for the Oil Bowl Game on August 29, 1952. Nor has it any contractual right to use Coyote Stadium at any time throughout the life of its contract, except for games in which its own team is a participant.

In view of our conclusions, it becomes unnecessary to consider any other propositions urged by Midwestern except one, which is that there is no point of error properly raising the question of the true meaning of its contract with the District. Its reasoning is that the trial court impliedly found, and the Court of Civil Appeals expressly found, that the contract gave Midwestern the right to sponsor and use the stadium for the playing of the Oil Bowl Charity Game, to sustain which finding there is "abundant record evidence"; that, therefore, to raise the matter there must be a point suggesting either a want or insufficiency of that evidence; and that since there is no such point anywhere in the record, the question is not before this court. It is enough to say that, in this case, the construction of the contract is not a question of fact but is a question of law, which is adequately raised by both the District and the League.

In its several well-written briefs and arguments the District urges numerous contentions against the validity of Rule 34. They are summarized in its answer to League's application for writ of error under what it designates as "Respondent's Topical Contentions". There are five of these. We have resolved the first in District's favor in holding that its contract with Midwestern does not give Midwestern the right to use Coyote Stadium for playing or sponsoring any games except those in which its own team is a contestant. The other four contentions are: (2) That the District and the schools of Texas are quasi public entities subject to direct statutory control by the Legislature of Texas under the constitution of this state, citing Arts. 2780 and 2656, R. S., 1925; (3) that the District, as a matter of legal right conferred by our statutes, has within its discretionary power the right to say who shall use Coyote Stadium and for what purpose; therefore, the election to permit or forbid the playing of the Oil Bowl Game is within the statutory discretion of District's trustees, irrespective of sponsorship, citing Art. 2780, supra; (4) that District's administrative employees have no authority to bind the District, their principal, without direct authority "or via the Board of Education as provided in" Art. 2656, R. S., 1925; that even District's trustees, a quasi government agency, have no authority either to "sub-delegate" their powers or to make any contract which renders them incapable

of performing their public duty or exercising their statutory discretion; (5) "that there is no statute nor law forbidding the principals and athletic directors of high schools who are maintained by Independent School Districts in the State of Texas from joining voluntary athletic or scholastic associations for the purpose of furthering their public school purposes. That there is no law forbidding the trustees of an Independent School District from allowing their teachers (their employees and co-employees with the State of Texas and State Department of Education) from entering into such associations and agreeing to abide by their rules, and so abiding by their rules;—*provided such does not interfere with the performance of their duties to the public."*

It would seem that this Topical Contention (5) effectively disposes of the other three and leaves only decision of the question whether District's trustees, in taking membership in the League under an agreement to abide by its rules, have prevented the performance of their duties to the public to be interfered with, as stated in the proviso, which District has emphasized by italics.

■ Nobody can question that the public schools of this state "are quasi entities and are subject to direct statutory control" by the Legislature. But it would be impracticable, if not impossible, for the Legislature to resolve all the minute problems inevitably arising in the operation and management of public schools; so, as the District recognizes in its Topical Contention (3), supra, it has delegated those duties to the local trustees by such enactments as Art. 2780, supra, including (as to District's trustees) the discretionary power to say who shall use Coyote Stadium and for what purpose. We are in accord with that proposition as well as the holding in Southwestern Broadcasting Co. v. Oil Center Broadcasting Co. et al. (Texas Civ. App.), 210 S. W. 2d., 230, error refused, N.R.E., cited by the District in support that an independent school district, as a quasi municipal corporation, has the right to seek a profit out of football games played on its premises; in the exercise of which it has the same freedom as a private person or corporation in putting on the games, when that freedom is exercised to further the interests of the district.

■ The proposition in Topical Contention (4), supra, that the administrative employees of an independent school district cannot bind the district in the absence of direct authority is of no

moment because it is abundantly established by the undisputed evidence that District's trustees themselves negotiated the contract with Hardin College as well as the later contract with Midwestern. That the action of District's High School in joining the League with knowledge of Rule 34 and its limitations on District's use of Coyote Stadium for all-star games, by consent of its athletic director, coach, teacher or administrator, was regarded by the District as its own is clearly shown by the fact that, because of Rule 34, the District refused both Maskat Temple and Midwestern use of the stadium for the Oil Bowl Game after corresponding twice with League's Executive Committe about the effect of Rule 34; and by the further fact that the final denial of Midwestern's demand was a letter from the president of District's Board of Education "officially communicating" the information that it was impossible for District's Board to allow use of the stadium for the Oil Bowl Charity Game "under the terms of the contract which we have with your institution."

So District's contentions come down to this question: Did the action of District's trustees in taking membership in the League and agreeing to abide by its rules interfere with the performance of their duties to the public?

The advantages offered by the League to its members are so many and so extensive that both the president of District's Board and its superintendent "testified under oath on the stand that they felt it a part of their duty in office to see that their high school was a member" of the League. The superintendent swore that he considered "such items as debates, and one-act plays, and the various other items under the jurisdiction of the League's mandates, to be important to the education" of the children of his district; that he likewise thought that the playing of high school football is "good for the general educational picture"; that he deemed it his *duty and obligation* to furnish his students with those facilities; and that he "preferred not to have any part of a School District that wasn't a member of the Interscholastic League."

■ These advantages exist, it must be remembered, despite Rule 34. The advantages of District's affiliation with the League being so overwhelming that it asserts that it joined under compulsion, rather than voluntarily, and as a matter of public duty, it simply cannot be plausibly maintained that its membership and consequent agreement to abide by Rule 34 interfered with

the performance of the duties owed by the District and its officers to the public. Certainly when the advantages of membership, as described by the District itself, are weighed against the burdens incident to membership which, concretely stated, are that its high school cannot permit use of its stadium for the Oil Bowl Game, hence will lose $600 and such other advantages as might incidentally be enjoyed by the District, the advantages far outweigh the burdens. This the District frankly recognizes in its pleadings and its arguments as well as by its action in joining the League. Therefore, we hold that the restriction imposed by Rule 34 is valid and cannot be enjoined. In this conclusion we neither ignore nor minimize the high purpose which the playing of the game would serve by the application of the net proceeds to charity. But that fact has no bearing on the question before us.

Contention is made by the District, alternatively to the question just decided, that Rule 34 is not uniform in its application and is discriminatory in that it excepts from its ban of all-star games, the all-star game sponsored by the Texas Coaches Association. We see no discrimination or lack of uniformity in the respect indicated. Under the Rule, *any* member of the League may permit the playing in its stadium of the all-star game sponsored by the Texas Coaches Association; *no* member may permit any other all-star game to be played in its stadium.

The judgments below are reversed and judgment is here rendered that Midwestern take nothing as against either the League or the District and that the District take nothing as against the League.

Costs are taxed 2/3 against Midwestern and 1/3 against the District.

Opinion delivered February 25, 1953.

Associate Justice Culver not sitting.